UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. 16-CR-29 (MPS) |
| TIMOTHY BURKE | : | May 23, 2016 |

**MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW OF DETENTION ORDER**

Mr. Timothy Burke is presently detained pending trial in connection with a second superseding indictment, filed on April 27, 2016, charging Mr. Burke with offenses including mail and wire fraud, aggravated identity theft, tax evasion, and money laundering. Mr. Burke was initially charged by complaint and following his arrest on November 19, 2015, was ordered detained by Magistrate Judge Merriam on November 24, 2015. On February 21, 2016, Magistrate Judge Merriam denied Defendant's motion to reopen the detention hearing. Defendant now moves for review of the detention order before the District Court pursuant to 18 U.S.C. § 3145(b) and requests that the detention order be vacated and that Mr. Burke be released from custody subject to the conditions outlined below.

Mr. Burke is a 64-year-old man who is alleged to have engaged in financial offenses including fraud and tax evasion. He has been held in federal custody on these charges for over six months based upon the Magistrate Judge's determination that he would pose a risk of flight if released. As discussed below, the concerns regarding flight by Mr. Burke in significant part rely on assumptions that the emerging factual record does not support or improperly conflate concerns

about alleged dishonest conduct with risk of flight. Finally, to the extent that a risk of flight does exist, it may be substantially mitigated through the conditions proposed below.

## PROCEDURAL HISTORY

The Court (Merriam, MJ) initially ordered Mr. Burke detained on the ground that, as of the Court's December 7, 2015, order, there were no available conditions of release that could satisfactorily assure Mr. Burke's presence in court. The Court did not order Mr. Burke detained based on any danger to the community. The Court's concerns regarding flight risk included that Mr. Burke appeared to easily acquire liquid assets, that he had a history of untreated alcohol and gambling addiction, that he does not have a history of stable employment outside of real estate, that his community ties are to people connected to the pending charges, that he is alleged to have committed offenses while on supervised release, and that he may face additional weapons charges. *See* Order of December 7, 2015 (DE #19). Following the Court's Order, Mr. Burke was accepted to the Salvation Army Adult Rehabilitation Center. Defendant subsequently moved for Mr. Burke's release to the treatment program. That motion was denied without a further hearing. This motion followed.

## LEGAL STANDARD

The Bail Reform Act of 1984 creates a presumption that Mr. Burke shall be released, and he may be properly held in this matter only if "no condition or combination of conditions will reasonably assure the appearance of [Mr. Burke] as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e)(1). "[T]he government [bears] the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community. The government [bears] the ultimate burden of persuasion by the lesser standard of a preponderance

of the evidence that the defendant presents a risk of flight." *United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted).

This Court has jurisdiction under 18 U.S.C. § 3145(b) to resolve the question of Mr. Burke's detention. Notwithstanding the previous decision of the Magistrate Judge, this Court must review the issue of bail *de novo*—that is, the Court "should fully reconsider [the] magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *United States v. Leon,* 766 F.2d 77, 80 (2d Cir. 1985).

**ALLEGATIONS OF DECEITFUL CONDUCT DO NOT ESTABLISH RISK OF FLIGHT**

In order to show that Mr. Burke should continue to be held without bond based on flight risk, the government must show by a preponderance of the evidence that he actually is a flight risk. The Government has not done so; instead, it has put forward a number of allegations—many of them paralleling the underlying criminal charges—suggesting that Mr. Burke is dishonest.

Unlike drug offenses, certain weapons offenses, and offenses against minors, § 3142(e)(2) does not treat offenses of fraud or deception such as those charged in this case as inherently triggering a presumption of detention. To the contrary, under § 3142(f) a detention hearing cannot even be held with respect to these charges absent a finding that there is "a serious risk" that the defendant will either flee, obstruct justice, or intimidate a witness or juror. Even when the Court determines that there is such a "serious risk," the Bail Reform Act instructs the Court to release the defendant subject to an unsecured bond if possible. If that is insufficient, the Act instructs the Court to still release the defendant subject to the least restrictive set of conditions that will reasonably

mitigate that risk. Only if *no* available conditions may mitigate the risk may the defendant be detained.

As the Magistrate Judge in the Bernie Madoff matter has articulated, the function of this two-tiered approach is to provide a mechanism for release even for defendants who cannot be inherently trusted. The Court (Ellis, MJ) explained:

> Only if the Court determines that trust of the defendant is insufficient to assure appearance and maintain safety should the Court impose additional conditions. One need only review the conditions enumerated in § 3142(c)(1)(B) to conclude that these measures are designed for situations in which the Court has determined that additional safeguards are necessary to control the defendant.

*United States v. Madoff*, 586 F. Supp. 2d 240, 255 (S.D.N.Y. 2009). In so reading the Bail Reform Act, the Magistrate Judge expressly rejected the Government's contention that "the setting of bail condition [rather than imposing detention] is based, fundamentally, on the trustworthiness of the defendant." *Id*.

The distinction between the question of trustworthiness and the need for detention is further illustrated in the Third Circuit's decision in *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986). The Court in that matter rejected detention based on risk of flight notwithstanding that the defendant had been indicted for crimes involving false identification allegedly committed while on probation for a conviction of a crime involving dishonesty, explaining that:

> While it is true that the defendant stands accused of an unlawful deceit, there is, of course, no *per se* presumption of flight where the crime charged involves the production of fraudulent identification. The defendant's past convictions do indicate a propensity over a period of time to engage in similar unlawful deceits. *The purpose of* 18 U.S.C. § 3142(e) *risk of flight determination, however, is not to detain habitual criminals or deceitful persons; it is to secure the appearance of the accused at trial.*

*Id.* at 161 (emphasis added). The Court in *Himler*, emphasizing that "the record indicates that the defendant when previously accused of similar crimes and not detained always appeared in court as required," *id*., reversed the district court's detention order and remanded the matter for the setting of bail conditions. *Id*. at 162.

**MR. BURKE DOES NOT POSE A RISK OF FLIGHT.**

Mr. Burke is a 64-year-old US citizen and longstanding Connecticut resident. He has significant ties both to family and to property here in Connecticut, does not even own a passport, lacks the financial means to flee, and he has a demonstrated history of complying with the terms of pretrial release.

With respect to family ties, Mr. Burke has several family members in this state who have agreed to serve as co-signors on a bond in this matter. These include not only Mr. Burke's two brothers, who previously offered to serve as co-signors, but also a sister and a son, two people who were previously not available as co-signors. All four of Mr. Burke's relatives work—one as a firefighter, one as a renovator/remodeler, one in retail, and one as a physician's assistant. An additional person who knows Mr. Burke has also volunteered to co-sign a bond.

Mr. Burke also owns or has invested in several properties in the state. One of these properties, a multi-unit complex in West Haven, is owned by Mr. Burke. At the time of the initial detention hearing in this matter, the property was the subject of foreclosure litigation, diminishing its worth as surety. That litigation is no longer pending, and Mr. Burke remains the owner of the property, which he is willing to post to partially secure the proposed bond in this matter. In addition to this property, Mr. Burke also has several other long-term real estate ties to the state, including a large single-family house in Easton, Connecticut, that contains several apartments and offices that

Mr. Burke leases with a future option to purchase; and a single-family house in Bridgeport in which Mr. Burke is a mortgage co-signor. Mr. Burke, unlike a defendant with no family or real property, cannot simply uproot his life and take it elsewhere without considerable sacrifice. Were he to flee, he would lose not only his investments in the properties discussed above, but he would also create significant hardships for those family members who have offered to serve as co-signors on a bond.

Mr. Burke's long-term investments in real property here in Connecticut and the moral support of his family are things of real value that Mr. Burke stands to lose if he flees. These things are not, however, the sort of liquid assets that would also provide Mr. Burke with the means to flee. Indeed, at the time of Mr. Burke's arrest in this case, for want of liquid assets Mr. Burke was facing potential foreclosure on the properties in West Haven and in Bridgeport. The litigation with respect to the West Haven property has been resolved, a development that enhances Mr. Burke's ability to post the property as collateral but that does not reflect an increased availability of liquid assets.

The Government has pointed to several documents it asserts indicate that Mr. Burke may in fact possess liquid assets. First and most significant, the Government has pointed out that in the summer of 2015 hundreds of thousands of dollars a month travelled into and out of Mr. Burke's business bank account, peaking in August of 2015, when over $500,000 travelled into then out of the account. According to the Government's analysis, these funds consisted principally of money deposited into Mr. Burke's account as cash and checks written from Mr. Burke's business to him personally and subsequently cashed at a check cashing agency. DE #16 at 3.[1]

[1] For the Court's convenience, Defendant is separately filing under seal the documents provided by the Government to Judge Merriam by hand delivery on December 3, 2015, for in camera review.

The Government speculates that Mr. Burke has secreted away the money that left his account. Notwithstanding an investigation spanning over a year, however, the Government has not provided any account of *how* Mr. Burke's income in its view purportedly skyrocketed from approximately $45,000 per month in February to approximately $450,000 in July and $560,000 in August. It strains credulity to believe that during July and August of 2015, while being actively investigated by the Government, Mr. Burke had annualized income on the order of $6 million that the Government cannot account for despite having access to all of the materials seized from Mr. Burke's properties pursuant to multiple search warrants. *See, e.g.,* DE ##23, 24.

Moreover, the records themselves do not substantiate the Government's contention. Rather, the records are entirely consistent with the money flowing into Mr. Burke's account as cash effectively representing short-term loans made by check-cashers to Mr. Burke, roughly following the normal course of business for a check-cashing enterprise. Such loans, once repaid to the check casher, would be expected to leave a remaining net value of zero—which is approximately the net change in Mr. Burke's bank account from month to month.

*Mr. Burke has a demonstrated history of appearing for court as directed.*

In a prior 2002 federal criminal case in which Mr. Burke was charged with financial offenses, Mr. Burke was released on a $50,000 bond (the same bond set in the case of Mr. Burke's codefendant in this case). *See United States v. Burke et al.*, 02-cr-00315-SRC (D. NJ), DE #3. There is no indication that Mr. Burke ever failed to appear for his court appearances in that case, and following a guilty plea he self-surrendered to serve a sixty-month sentence. *Id.*, DE #43. Mr. Burke served his sentence at minimum security camps without incident. In this respect, Mr. Burke's prior conduct mirrors that of the defendant in *Himler*. As the Third Circuit emphasized in ordering the

defendant in that case released, "the defendant when previously accused of similar crimes and not detained always appeared in court as required." 797 F.2d at 161.

The course of the investigation of the present case, moreover, further undermines any suggestion that he is likely to flee to avoid prosecution. As the complaint affidavit notes, agents executed a federal search warrant of Mr. Burke's office on November 3, 2014—over a year prior to Mr. Burke's arrest. Mr. Burke subsequently engaged in negotiations with federal authorities through counsel. After a warrant was issued for Mr. Burke's arrest, he turned himself in, again working through counsel.

The Government contends with respect to Mr. Burke's prior conduct that he may have engaged in activities while on supervised release that were in violation of the term of his release requiring that he "refrain from employment in the real estate business or mortgage industry." *United States v. Burke*, 02-cr-00315 (SRC) (D.N.J.), DE #43. While Mr. Burke was on supervised release, both the Court and Probation appear to have been aware of Mr. Burke's relationship with Birmingham Investments, a company belonging to Kerry Burke (Mr. Burke's brother) of which Mr. Burke was not a principal at the time. *See* 02-cr-00315 (SRC) (D.N.J.), DE #53; 16-cr-29 (MPS) DE #53 Ex. 1. Mr. Burke's supervised release was never violated. More significant, there is no indication that Mr. Burke ever failed to report to Probation as directed or that he ever left the jurisdiction without permission—conduct that might indicate a propensity for flight.

The Government also asserts that "[e]ven though Burke is detained, it has not stopped him from engaging in the real estate activity he claims he can forswear if release[.]" DE #53 at 6. The "real estate activity" the government refers to concerns a property in West Haven that Mr. Burke

owns. It is unclear why addressing legal and logistical issues related to a building that Mr. Burke owns and is obligated to maintain is in any way problematic. Quite the opposite—as noted above, this property is among Mr. Burke's concrete ties to Connecticut, and his continued investment of energy in the property is inconsistent with his flight and abandonment of the property.

*The alleged conduct does not show Mr. Burke to be able to assume false identities.*

The Government alleges that Mr. Burke has assumed a number of aliases, has operated under the auspices of multiple businesses, and has committed aggravated identity theft. Defendant intends to dispute the accuracy of the Government's allegations, but even taken on its face, the Government's lengthy factual recounting does not provide any indication that Mr. Burke has produced any false travel document or other means of identification that would allow him to travel undetected in aid of escape. As alleged in the operative indictment, Mr. Burke's alleged use of aliases may raise questions concerning his honesty—but these allegations do not support a claim that he is a flight risk.[2]

*Mr. Burke suffers from physical ailments that limit his ability to flee.*

Mr. Burke, at age 64, suffers from a number of health complications, including a history of skin cancer, chronic arthritis, and an enlarged prostate. These health considerations limit Mr. Burke's mobility and make travel for him comparatively difficult. Indeed, because of these

---

[2] Notably, the Court in *Himler* held that even where the defendant was accused of producing false documents and so was "clearly capable of obtaining false identification," this was not sufficient to warrant detention where there was "no direct evidence to suggest that he would flee from prosecution in the future." *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986).

conditions even the transport from the Wyatt detention facility to court poses hardships that it does not for the ordinary inmate.

**MR. BURKE DOES NOT POSE A DANGER TO THE COMMUNITY.**

Mr. Burke, appropriately, is not detained on the basis of any danger he poses to the community, and the allegations of the complaint and of the succeeding indictments fall far short of providing clear and convincing evidence that Mr. Burke poses an ongoing threat of economic harm to the community. As in the case of Bernard Madoff (whose actions created extreme economic hardships), "it is far too great an extension to reach from the cases . . . that narrowly recognize the possibility of economic harm (and rarely conclude the economic harm presented rises to the level of a danger to the community for which someone should be detained) to such a conclusion [in favor of detention] based on the minimal evidence presented here by the Government." *United States v. Madoff*, 586 F. Supp. 2d 240, 254 (S.D.N.Y. 2009).

Although the Magistrate Judge declined to detain Mr. Burke on dangerousness grounds, she did express concern that "defendant could engage in this conduct anywhere, with minimal start-up resources." Order of December 7, 2015. Those concerns, while not indicative that Mr. Burke *would* engage in fraudulent conduct in the future, are addressed in the conditions proposed below.

Finally with respect to dangerousness, at the initial hearing, the Government also suggested that it may bring weapons possession charges against Mr. Burke based upon ammunition allegedly recovered in the basement of a home where Mr. Burke and others resided. Since that time the Government has brought three successive indictments against Mr. Burke. No weapons charges have been included in those indictments.

**A SOBER AND STABLE ENVIRONMENT IS AVAILABLE FOR MR. BURKE.**

At the time of the initial detention hearing in this matter, Defendant proposed that Mr. Burke be released to reside at a residence where he would remain under home confinement but from where would be permitted to operate his handyman business. Subsequent to that hearing, Mr. Burke secured approval to enter into the Salvation Army Adult Rehabilitation Center's approximately seven-month residential work and substance abuse recovery program. Defendant now proposes that Mr. Burke be released to that program.

For purposes of this case, the Salvation Army program serves two important functions. First, it provides a stable and controlled residential setting. Program staff will not only monitor Mr. Burke's whereabouts—and notify Probation promptly should he depart without permission[3]—but they will also enforce the program's strict rules, including a ban on cellphone use. The Court will therefore have assurance that while at the program Mr. Burke will not be engaged in any conduct resembling real estate transactions. Instead, he will be engaged in the productive, if humble, work of folding clothes and assisting with the Salvation Army's operations.

Second, and equally important, the Salvation Army is a rehabilitation program. The financial materials provided to the Court by the Government in connection with the initial detention hearings attest to Mr. Burke's significant alcohol consumption prior to his arrest. The Salvation Army program presents an opportunity for Mr. Burke not merely to *receive* treatment for alcohol abuse, but also to *live out* the staid and humble routines of sober living. Mr. Burke, now 64 years old,

[3] The proposed conditions of release do not include the use of electronic location monitoring as this would be redundant of the reporting function performed by Salvation Army. Defendant would submit to location monitoring if ordered by the Court as a condition of release.

knows that this is his one chance to show a sentencing judge that he is capable of such reform—and so he has every incentive to follow through with that commitment.

**PROPOSED CONDITIONS OF RELEASE**

Defendant submits that under the circumstances of the present case outlined above, the following conditions, in addition to the standard conditions, are more than sufficient to reasonably assure Mr. Burke's appearance and the safety of the community:

1. Release to reside at the Salvation Army Adult Rehabilitation Center and to abide by all rules of the Center;
2. A prohibition on all real estate or financial transactions;
3. A prohibition on possession or use of any cellular telephone (a condition imposed also by the Salvation Army);
4. A prohibition on use of the US Mail or other common carrier except to communicate with a designated list of family members and others to be provided to Probation;
5. A prohibition on opening or maintaining any bank accounts or lines of credit;
6. A requirement that Mr. Burke make regular financial disclosures to the Court;
7. A requirement that Mr. Burke initiate and maintain a credit freeze with the credit monitoring agencies;
8. A requirement that Mr. Burke participate in substance abuse and/or mental health treatment as directed by Probation;

3\. A $300,000 bond co-signed by Mr. Burke and five responsible persons whose contact information has been provided to the Office of United States Probation and who

would appear in Court to co-sign the bond and secured in part by property owned by Mr. Burke;

4. Strict supervision by the Office of United States Probation;
5. Travel restrictions limiting travel to the District of Connecticut;
6. A prohibition on the use of drugs or alcohol.

**CONCLUSION**

For the reasons above, Defendant requests that the Court order that Mr. Burke be released pending the trial of this case subject to the above conditions.

Respectfully submitted,

THE DEFENDANT,
Timothy Burke

OFFICE OF THE FEDERAL DEFENDER

Dated: May 23, 2016

/s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 23, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing

will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James P. Maguire
James P. Maguire