UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:16CR29 (MPS) |
| | : | |
| v. | : | |
| | : | June 6, 2016 |
| TIMOTHY W. BURKE, also known as "William Burke," "Bill Burke," "Kerry Saunders," "Pat Riley," "Jim Caldwell," "Jim Saunders," "Tom Morrisey," "Jimmy," "Phil Burke," "Phil," "Burt," and "M. Soler." | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER**

The United States hereby opposes the defendant's motion for a review of a detention order (Docket No. 90). The defendant, Timothy W. Burke ("Burke"), has been detained since his arrest on November 19, 2015 pursuant to a federal criminal complaint filed in this case. As reflected in the docket, Magistrate Judge Sarah A.L. Merriam conducted two previous bail hearings on November 24, 2015 and December 7, 2015 and ordered Burke detained on December 7, 2015. Burke then filed a second written bail motion dated February 8, 2016 that proposed a modified bond package. Judge Merriam denied that motion without further hearing on February 21, 2016. The instant motion to this Court, filed over three months later on May 23, 2016, followed.

This Court should deny the motion for the reasons stated below. Notwithstanding the differences in the proposed bond package Burke now presents to the Court as opposed to the ones he submitted to Judge Merriam, there is no reason why Judge Merriam's sound decisions should be disturbed: Burke remains a serious risk of flight should he be released. Moreover, although the prior detention orders did not reach the separate question of whether Burke is a danger to the

community, the record clearly and convincingly supports such a finding as well. As discussed below, no set of release conditions can reasonably assure Burke's appearance as ordered and the safety of the community.

# I. BACKGROUND

## A. Procedural History

### *1. Burke's Arrest and Initial Bond Proposal*

On November 19, 2015, Burke—who had previously been convicted in the District of New Jersey on similar fraud charges and received a five-year prison sentence—was arrested pursuant to a federal criminal complaint charging him with mail fraud, in violation of 18 U.S.C. § 1341. In summary, the complaint alleged that Burke used multiple aliases and corporate entities to defraud numerous homeowners who were facing foreclosure. He falsely represented to them that he (or his company) would purchase their homes and pay their mortgages, thereby allowing them to walk away from their homes without the burdens of home ownership. *See* Docket No. 7 ¶ 18. Burke then took control of their properties, did not pay the homeowners' mortgages as he promised, and instead rented out the properties to tenants and pocketed the rental income for his own enrichment. *Id.* ¶ 19. The scheme involved dozens of properties and spanned eight years, from 2008 to 2015. *Id.* ¶ 20. Burke began the scheme while he was still on supervised release from his prior federal conviction. *Id.* ¶ 16. He made hundreds of thousands of dollars to which he was not entitled. *Id.* ¶ 20.

In his initial bail motion dated December 4, 2015, Burke proposed to live with one of his brothers under home detention, on electronic monitoring, and an unsecured bond.[1] In his first

[1] It does not appear that a transcript for either of the prior bond hearings before Judge

motion, Burke emphasized his ties to the community. *See* Docket No. 14 at 2. In a written detention order dated December 7, 2015, however, Judge Merriam found that Burke posed a serious risk of flight because, among other reasons, "the nature of the offense is such that defendant could engage in this conduct anywhere, with minimal start-up resources. The offense charged involves numerous alleged misrepresentations, addresses, aliases, and financial accounts." Docket No. 19 at 2. Moreover, although Judge Merriam did not detain Burke on the basis that he was a danger to the community, she observed in the order that "[g]iven the apparently ongoing nature of defendant's conduct over the course of many years, including while on supervised release and more recently, while he was aware that he was under federal investigation, the Court finds that there is a risk to the community associated with defendant's release." *Id.*

*2. Burke's Second Bond Motion*

On February 8, 2016, Burke through counsel filed his second bond motion. Burke proposed that he be released to an unsecure facility, the Salvation Army, for substance abuse treatment. He initially proposed his two brothers and two other individuals as bond co-signers. After it became evident that the latter two individuals were not suitable as co-signers,[2] Burke withdrew them from consideration and proposed a third individual, Harold Wilson, as a co-signer.

On February 21, 2016, Judge Merriam denied Burke's second motion for release without a hearing. In a minute entry order, she observed that:

---

Merriam has been prepared. The government is relying on the parties' pleadings and its notes from the bond hearing to outline the prior proposals.

[2] The government learned that one of the individuals was a creditor of Burke and that the other individual lived out of state and did not have a readily identifiable relationship with Burke. *See* Docket No. 39 at 4-6.

> The defendant seeks a renewed bond hearing based on the addition of two new proposed conditions of release: (1) residence in the Salvation Army Adult Rehabilitation Center, and (2) an additional bond co-signer. The Salvation Army is not a secure facility, and the issue it is designed to address, substance abuse, was not the primary basis for the Court's finding that the defendant poses a risk of flight. As the Court stated in the Order of Detention [], the Court finds that the defendant poses a serious risk of flight, based on, inter alia: the nature of the offense; his criminal history including a prior federal conviction for similar conduct; his apparent violation of the conditions of his prior term of supervised release; and his alleged use of numerous business names, bank accounts, and aliases. The additional conditions proposed have no "material bearing" [under 18 U.S.C. § 3142(f)(2)] on the Court's analysis or conclusion. Accordingly, no new hearing is warranted and the defendant's motion is DENIED.

Docket No. at 42. Burke did not immediately appeal this order.

### B. The Indictment

Judge Merriam's last detention order was issued after Burke was initially indicted by a grand jury on February 10, 2016. The grand jury subsequently returned two superseding indictments against Burke and another co-defendant, Bradford Barneys, on March 30 and April 27, 2016. In the latest indictment, Burke is charged with one count of conspiracy, in violation of 18 U.S.C. § 1349, five counts of mail fraud, in violation of 18 U.S.C. § 1341, one count of wire fraud, in violation of 18 U.S.C. § 1343, one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A, one count of tax evasion, in violation of 26 U.S.C. § 7201, and three counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## II. Governing Law

"The government may detain a defendant prior to trial consistent with the Due Process Clause of the Fifth Amendment so long as confinement does not amount to 'punishment of the detainee.'" *United States v. Millan*, 4 F.3d 1038, 1043 (2d Cir. 1993). "Pretrial detention of a defendant, when of reasonable duration, serves important regulatory purposes, including the

prevention of flight and the protection of the community from a potentially dangerous individual." *Id*. The Bail Reform Act, 18 U.S.C. §§ 3141 *et seq*., sets forth the parameters for pretrial detention. Specifically, the Act provides that if, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer *shall* order the detention of the person before trial." 18 U.S.C. § 3142(e) (emphasis added).

This Court's review of a magistrate judge's detention orders is *de novo*. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985). "Under this review standard, this Court will judge the issues anew," but may rely on the "factual and evidentiary record developed during the detention hearing[s]" below. *United States v. Goba*, 240 F. Supp. 2d 242, 245 (W.D.N.Y. 2003). Moreover, the Court may also accept additional evidence. *See United States v. Colombo*, 777 F.2d 96, 98 & n.1 (2d Cir. 1985); *United States v. Marra*, 165 F. Supp. 2d 478, 480-81 (W.D.N.Y. 2001). The Court must reach its own independent conclusion and not "simply defer to the judgment of the magistrate." *Leon*, 766 F.2d at 80.

In determining whether to detain a defendant before trial, this Court must consider the following factors: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. *See* 18 U.S.C. § 3142(g). With respect to the history and characteristics of the defendant, the Court is obligated to consider both "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and

record concerning appearance at court proceedings" as well as "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3).

The government bears the burden of persuasion that the defendant is a risk of flight by a preponderance of the evidence or a danger to others and the community by clear and convincing evidence. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). A detention hearing, however, is not an evidentiary hearing. The parties may proceed by proffer and the rules of evidence do not apply. *See United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000) (per curiam); *see also United States v. Fortunato*, 51 Fed. Appx. 350, 352 n.1 (2d Cir. Nov. 21, 2002) ("It is well-settled law that the government may proceed by proffer at a bail or bail revocation hearing.") (citing *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995)) (summary order); *United States v. Russel*, 208 F.3d 204, 2000 WL 305506, at *1 (2d Cir. Mar. 22, 2000) (government may proceed by way of proffer at detention hearings and methods used to scrutinize government proffers lie within discretion of judge).

## III. Discussion

### A. Burke is a Serious Risk of Flight.

As reflected in her February 21, 2016 order, Judge Merriam continued Burke's detention after considering the "nature of the offense; his criminal history including a prior federal conviction for similar conduct; his apparent violation of the conditions of his prior term of supervised release; and his alleged use of numerous business names, bank accounts, and aliases." Docket No. 42. Nothing has changed about Burke's circumstances to warrant a different

conclusion by this Court.

1. *Burke Evaded Arrest in This Case for 16 Hours.*

As an initial matter, the Court need not wonder whether Burke would conceivably be a flight risk, because Burke evaded arrest in this very case for sixteen hours before finally turning himself in. As the government set out at Burke's November 24, 2015 detention hearing, the government obtained a sealed criminal complaint for Burke on November 18, 2015. In connection with an anticipated arrest, investigating agents conducted surveillance of Burke's residence in Easton that afternoon. At that time, agents saw an individual who they believed to be Burke at the house loading boxes into a relative's car. That relative, Burke's niece, saw the surveillance car and, accordingly, the government decided to execute the arrest warrant as soon as safely possible.

At approximately 7:45 p.m. that night, federal agents knocked on the door of Burke's home and spoke with Burke's son Ryan Burke, a tenant of Burke's who lived at the home, and Burke's niece. The agents informed them that there was an outstanding warrant for Burke's arrest and was told that Burke was not at the house. After consent, the agents performed a limited security sweep of the residence. In connection with that sweep, Ryan attempted to reach Burke by phone and handed the phone to an agent. The agent left a voicemail for Burke informing him that the government had a warrant for his arrest and that Burke should contact agents immediately so that he could be taken into custody.

After agents left Burke's house at approximately 7:57 p.m., an agent sent a text message to a number provided by Burke's son identifying himself and notifying Burke that: "We have a warrant for your arrest. Contact me immediately so that we can arrange to take you into custody."

The agents then went to Burke's office, which is in the basement of another house in Easton. There, they spoke to Burke's tenant in another part that house, who informed agents that he didn't know where Burke was but had seen him at the office earlier that day. The investigating agents then departed the office and tried to contact Burke by cell phone. It appeared that Burke had shut off the cell phone number given to agents by his son.

The agents then returned to Burke's house at approximately 8:45 p.m. Ryan answered the door, who informed agents that he had spoken to Burke ten minutes after agents left the house at approximately 8 p.m. Burke said he told his father that agents were "serious" about arresting Burke that night. Burke told his son that it made sense given the timing of his pending eviction from his residence. Ryan reportedly told Burke that the situation would only get worse if he didn't turn himself in; Burke said he understood that there was a warrant for him and hurriedly got off the phone. While the agents were speaking with Ryan, he got a call from his uncle, Kerry Burke. The agent spoke to Kerry and informed him of Burke's arrest warrant. The agents spent the rest of night looking for Burke, but to no avail.

The next morning, agents returned to Burke's house at approximately 7:20 a.m. They spoke once again to Ryan and the same tenant. After consent, the agents conducted another protective sweep. Burke's tenant informed agents that he had spoken to Burke approximately 45 minutes after they left last night. Burke reportedly responded with a heavy sigh and said it was a tough situation.

The agents then went to see Kerry Burke and an associate, Matthew Bethley, to locate Burke's whereabouts and to inform them that agents were looking for Burke. At approximately 10:30 a.m., agents were invited to accompany Burke's landlord into Burke's residence for a

previously arranged inspection of the house. During that time, Burke attempted to call Ryan from a new number. Ryan handed the phone to the agent, who informed Burke directly that he needed to turn himself in. Burke said he called to speak to his son and hung up on the agent.

Sometime after 11 a.m., Burke attempted to contact Bethley, who was at Burke's office and where other agents were already located. An agent got on the phone and spoke to Burke and informed him of the warrant. Burke hung up on that agent as well. Near noon, agents learned that Burke was at predecessor counsel's law offices in Bridgeport. By arrangement between predecessor counsel and the government, the agents arrived there to execute the warrant. Burke was arrested without incident at approximately 12:10 p.m.

In summary, Burke knew as early as 8 p.m. on the night of November 18th that he was wanted for an arrest when Ryan spoke directly to him, yet refused to turn himself in until after noon the next day. Burke not only hung up the phone on two federal agents looking for him, but put multiple government agents, as well as Burke's family members and tenants, in the middle of a potentially dangerous situation. Burke was a fugitive for 16 hours. This course of conduct is consistent with Burke's history of putting his own interests ahead of the interests of justice. The government has no reason to believe that he would be any different on release, particularly now that he has been indicted and faces trial.

*2. The Proposed Surety is Woefully Inadequate.*

Burke's latest bond package is fatally deficient because, as before, it offers no meaningful surety to deter Burke from fleeing. In short, he has nothing to lose by fleeing. Burke now offers the surety of 267-269 Union Avenue, West Haven, a condemned and dilapidated apartment building that Burke owns (under the name "T. William Burke") through one of his nominee

entities, Union Avenue Associates LLC. *See* Ex. 1. The building has a tarp over part of its roof and has apparent mold on its walls. *See* Ex. 2 at 1, 7.[3] Burke has not represented—much less substantiated through an appraisal, title search, and other documentation—the available equity in this property. While it is true that the property is no longer in foreclosure, *see* Ex. 3, there are so many substantial liens on the property that, combined with the poor physical shape of the property, it cannot serve as a surety for this Court's consideration.

According to Vision Appraisal, 267-269 Union Avenue has an appraised value of $233,900. *See* Ex. 4. However, in connection with a foreclosure action on the property by Burke's mortgage holder, a certified appraiser valued the property at only $100,000 as of October 9, 2015. *See* Ex. 5. Burke owes numerous creditors far in excess of $100,000. To start with, he has a mortgage with an outstanding balance of $195,650.00 as of June 1, 2015, an amount that was converted to a judgment. *See* Ex. 6. It is not clear what the current balance is on the mortgage, but Burke did not seem to contest a balance in the amount of $195,650.00 as of October 27, 2015, less than one month before he was arrested. *See* Ex. 7. The mortgage has not been released.

In addition to the mortgage, other longstanding creditors would have superior claims to the property before any hypothetical lien by the United States could even be filed. As of March 30, 2016, for example, there was a water lien on the property in the amount of $10,075.22. *See* Ex. 8. The City of West Haven has also placed a relocation lien of $20,400.00, which reflects the expenses it incurred to relocate tenants from 267-269 Union Avenue after the building was

---

[3] An investigating agent took the photographs in Exhibit 3 on or about May 27, 2016 upon the invitation of a tenant at 267-269 Union Avenue who was in the process of moving out. As displayed in the second picture, the property was condemned on November 20, 2015, the day after Burke was arrested on a federal criminal complaint in this case.

condemned. *See* Ex. 9.[4] In addition, there are outstanding taxes and sewer fees totaling over $47,000. Ex. 10.[5] By the government's estimate, then, there is already at least $273,125.22 of outstanding obligations on the proposed surety property on a value that is worth $100,000.

The government notes that, despite Burke's claims to numerous victims that he would purchase their property and that he represented to an undercover news producer posing as a potential tenant that he and his partners "own" 89 properties,[6] he has not identified any property that could serve as an adequate surety. 267-279 Union Avenue is no different.

3. *The Salvation Army is Not a Secure Facility and Cannot Prevent Burke from Fleeing.*

Burke had previously argued that going to the Salvation Army to live, work, and receive

---

[4] According to the lien notice:

> Said Emergency Relocation of "displaced" occupants was determined and ordered by the Commissioner of Human Resources, Beth A. Sabo after a Notice to Owner and Notice of Potential Liability dated November 20, 2015 were provided to the Owner, Union Avenue Associates, LLC as well as a Cease and Desist Order dated July 1, 2015 issued by the West Haven Planning and Zoning Department and thereafter to November 20, 2015 whereupon it was determined that the dwellings units constituted an immediate and serious threat to the health and safety of the occupants of those dwelling units.

Ex. 9 at 1.

[5] The City of West Haven sold the debt obligation for the outstanding taxes and sewer fees to a third party, the Marcus Law Firm. Based on its investigation, the government understands that the Marcus Law Firm paid an undisclosed amount to the City of West Haven, but is legally empowered to collect from Burke the full amount of the unpaid taxes and sewer fees. Thus, the reason why there are no outstanding balances due to the City of West Haven in Exhibit 10 is because of its sale of the obligation to the Marcus Law Firm, not because Burke or Union Avenue Associates has actually paid these bills.

[6] *See* http://www.nbcconnecticut.com/troubleshooters/Troubleshooters-Uncover-Man-at-Center-of-Foreclosure-Operation-283004251.html at 4:48.

substance abuse treatment for at least seven months—the term of the program—would benefit him. *See* Docket No. 36 at 2-3. The primary issue before the Court, however, is not what treatment programs may benefit Burke. As Judge Merriam noted, "the issue [the Salvation Army] is designed to address, substance abuse, was not the primary basis for the Court's finding that the defendant poses a risk of flight." Docket No. 42. Rather, it is the non-secure nature of the facility that concerned Judge Merriam and the government.

The government has grave doubts that Burke could manage in such a setting. Burke is used to being in charge, has been in charge, and wants to be in charge. During the course of the charged scheme, he directed numerous employees what to do, when to do it, how to do it, and continually pushed them and himself to do more. Burke failed to heed investigating agents' directions to turn himself in, instead choosing to do what he wanted to do on his own timeframe. Even after his arrest in this case, he directed Kerry Burke to collect rent at 267-269 Union Avenue. *See* Docket No. 53 at 5 n.1. Whatever restrictions the Salvation Army has would certainly not be enough to discourage Burke from doing whatever it is he wants to do, including fleeing.

*4. Burke Has Weak Ties to the Community.*

Although Burke claims to have "significant ties both to family and to property here in Connecticut," Mot. at 5, the quality of those ties are insufficient to keep him in Connecticut. None of the five proposed co-signers have offered any surety for bond purposes. Indeed, at least two of his proposed bond co-signers—Kerry Burke and Susan Allen—have been used by Burke in furtherance of the charged scheme. His brother Kerry, for example, has been used by Burke on various corporate entities and bank accounts utilized in the charged criminal conduct. *See, e.g.*, Exs. 11, 12. Kerry was also reportedly the front for Burke's illicit real estate activity while he was

on federal supervised release. *See* Docket No. 7 ¶ 22. As for his Burke's sister Susan, multiple witnesses have told the government that she worked for Burke as recently as late 2014, including making telephone calls to tenants to collect rent. She also cashed checks for Burke at X-Bankers, one of the check cashing services Burke utilized.

Another proposed co-signer—Burke's son Sean—has not previously shown up to Court or been offered as a custodian. Finally, the fifth proposed co-signer—Harold Wilson—is not particularly close to Burke. The government understands that Harold Wilson has known Burke for approximately four years on a professional level and was a real estate broker on some of Burke's transactions.

Importantly, at the time that government agents were attempting to locate Burke to arrest him pursuant to a warrant, Burke was in touch with both his brother Kerry and his other son Ryan (who Burke has previously proposed as a co-signer). Neither of them, however, could convince Burke to turn himself in; indeed, the dynamics of the Burke family are such at that Burke himself controls the situation and used family members for his own criminal purposes. Even after Burke was detained in this case, he instructed his brother Kerry to continue to collect rent at 267-269 Union Avenue in West Haven. Thus, the mere fact that the proposed co-signers are family members does not alleviate Burke's risk of flight. Indeed, they may help facilitate it.

*5. Burke Has a Troubling History of Making False and Misleading Representations to the Court and the Government.*

The Court should also take notice of Burke's numerous misleading, incomplete, and false representations to the Court and the government in connection with his prior federal case and in this case. As the government outlined in previous oppositions to Burke's bond motions and in prior hearings:

- After Burke became aware of the federal investigation and retained experienced predecessor counsel, he opened an escrow account in December 2014 in the name of Quality Asset Management Services, LLC, purportedly as a sign of good faith to show the government his financial affairs and to show transparency. In fact, the government learned on its own that Burke never used that account and instead opened another, secret account to continue his ongoing criminal conduct. *See* Docket No. 7 ¶¶ 79-84.

- While he was on federal supervised release, Burke petitioned in June 2009 for early termination of his supervision. *See* Exs. 13, 14. Burke falsely represented to a district court judge in the District of New Jersey that he wanted to move to Ireland in order to better take care of his son. The judge in New Jersey granted the motion. *See* Ex. 15. In fact, Burke never traveled to Ireland or even obtained a passport and his son confirmed that Burke never discussed moving to Ireland with him.

- Although Burke has consistently maintained that he is indigent and does not have the means to retain counsel (and submitted *ex parte* representations to the Court to that effect), it remains unclear what he did with the enormous sums of money—primarily cash—that was going through just one of his nominee accounts. *See* Docket No. 58 ¶¶ 76-80; Docket No. 16 at 3-4.

Each of these incidents, while perhaps not conclusive in and of themselves, should be weighed by the Court against the entire context of Burke's "history and characteristics," "character," and "past conduct." 18 U.S.C. § 3142(g)(3)(A). Moreover, the Court must also consider whether, "at the time of the current offense," Burke was under court supervision. 18 U.S.C. § 3142(g)(3)(B). As alleged in the affidavit in support of his federal criminal complaint, Burke began his scheme while he was federal supervised release. *See* Docket No. 7 ¶¶ 21-25.

*6. The Evidence of the Serious Allegations Against Burke is Strong.*

Burke is facing serious charges that, in the main, allege that he defrauded numerous individuals and lenders, as well as the IRS, by using other identities and nominees to get money to which he was not entitled. He is alleged to have begun his crime while he was on federal supervised release from his prior federal fraud conviction for a similar fraud that also targeted

distressed homeowners facing foreclosure. He has utilized multiple aliases through his adult life—not only in this case, but in the underlying New Jersey conviction as well—and his ability to use and assume those identities in connection with his fraud, as well as his access to large amounts of cash, makes him an acute flight risk.

The case against Burke is strong. At trial, the government intends on calling homeowners who will testify that they received a solicitation letter from one of Burke's numerous entities promising them that it would purchase their home in foreclosure quickly. Burke then represented to the homeowners, often with the aid of attorney and co-conspirator Bradford Barneys, that they would be relieved of their obligations to pay the mortgage and other costs associated with their home. Contrary to those representations, Burke instead rented out the properties, pocketed the proceeds, and failed to pay any of the homeowners' financial obligations. With respect to the tax evasion charge, Burke's own records show that he self-assessed hundreds of thousands of dollars of tax liability and that, despite knowing he owed those taxes, took elaborate steps to frustrate the IRS's ability to obtain that tax revenue, including instructing tenants to pay rent in cash, using nominee accounts in others' names, and structuring millions of dollars of cash deposits into accounts he controlled.

Burke's incentive to flee only increases given the substantial sentence he may receive if he were convicted after trial. Each of the conspiracy, mail fraud, wire fraud, and money laundering Burke faces carries a maximum term of 20 years in prison upon conviction. In addition, a conviction for the count of aggravated identity theft carries a mandatory, two-year consecutive sentence. Thus, Burke faces a substantial prison sentence if convicted, particularly given his significant criminal history. This possibility only increases his incentive to flee if he were

released now.

**B. Burke Remains a Danger to the Community if Released.**

Although Judge Merriam did not order Burke detained based on a finding that he would pose a danger to the community, she did express her concern that "[g]iven the apparently ongoing nature of defendant's conduct over the course of many years, including while on supervised release and more recently, while he was aware that he was under federal investigation, the Court finds that there is a risk to the community associated with defendant's release." Docket No. 19 at 2.

Here, there is clear and convincing evidence that Burke would continue to engage in criminal activity if the Court were to release him. The government executed a search warrant of Burke's offices in November 2014, over a year before his arrest. Nevertheless, the clear evidence is that Burke continued to engage in the charged scheme during that year. When agents executed a second search warrant on those same offices a year later, they located foreclosure lists, solicitation letters, and a business card advertising Burke's "37 years of real estate experience" and "Creative Property Transactions." Docket No. 58 ¶¶ 106-108. More importantly, Burke continued to defraud additional victims and the IRS. *See, e.g., id.* ¶¶ 72-105. There is no record indication that Burke can and would stop his criminal conduct if the Court decided to release him.

## CONCLUSION

Burke's record shows that he cannot follow court orders and is not amenable to supervision. In light of Burke's prior criminal history and his conduct in this case, the Court cannot be assured that the latest bond proposal would assure Burke's appearances as required or that he would stop his criminal conduct. Accordingly, the motion should be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

__________/s/_______________
DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07247
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700

CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, a copy of the foregoing GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. In addition, a copy of the foregoing was e-mailed to:

Lauren Harte
United States Probation Officer

________/s/__________________
DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY